# In the United States Court of Federal Claims

No. 06-467 C

(August 10, 2006)[1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * | * | |
| A&D FIRE PROTECTION, INC., | * | |
| | * | |
| *Plaintiff*, | * | |
| | * | Bid Protest; Task Order Post- |
| v. | * | Award Challenge; 28 U.S.C. § |
| | * | 1491(b) (2000); 41 U.S.C. § |
| THE UNITED STATES, | * | 253j(d) (2000); 48 C.F.R. § |
| | * | 16.505(a)(9) (2005); Statutory |
| *Defendant*, | * | Bar on Bid Protests of Task |
| | * | Orders; No Standing for a Bidder |
| HERNANDEZ CONSTRUCTION | * | Who Failed to Submit the |
| CORP., | * | Required Bid Bond. |
| | * | |
| *Intervenor-Defendant*. | * | |
| | * | |
| * * * * * * * * * * * * * * * | * | |

*William L. Bruckner*, San Diego, CA, for plaintiff.

*Douglas K. Mickle*, United States Department of Justice, with whom were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, *Mark Melnick*, Assistant Director, Washington, D.C., for defendant. *Cecillia Chu* and *Margaret Haggerty*, United States General Services Administration, San Francisco, CA, of counsel.

*John A. Yacovelle*, San Diego, CA, for intervenor-defendant.

---

[1]/ This opinion was originally filed under seal on July 20, 2006, in accordance with the protective order requested by the parties. The parties proposed no redactions and agreed that the information contained herein could become part of the public record of this action.

# OPINION

**Bush**, *Judge*

A&D Fire Protection, Inc. (A&D) filed its post-award bid protest complaint on June 20, 2006. Plaintiff seeks a declaratory judgment voiding the award of Contract No. GS-09P-03-KSD-0186, Order No. P-09-06-WP-0029, Project No. RCA 13863, to Hernandez Construction Corporation (Hernandez). Plaintiff has also requested a temporary restraining order and preliminary injunction against continued work performance on this contract for the design and replacement of a fire alarm system for a federal building in California. The court established, with the parties' input, an expedited briefing schedule to decide plaintiff's motion for injunctive relief and the merits of this bid protest.

The court now has before it Plaintiff's Application for Temporary Restraining Order and Preliminary Injunction (TRO Mot.), Defendant's Motion to Dismiss, and in the Alternative, Motion for Judgment on the Administrative Record (Def.'s Mot.), Intervenor Hernandez Construction Company's Motion to Dismiss and/or Motion for Judgment on the Administrative Record (Int.'s Mot.), and Plaintiff's Motion for Judgment on the Administrative Record (Pl.'s Mot.). These motions have been fully briefed. Oral argument was held on July 14, 2006. For the reasons discussed below, defendant's and intervenor-defendant's motions to dismiss are granted, defendant's and intervenor-defendant's motions for judgment on the administrative record are denied as moot, and plaintiff's motions are denied as moot.

## BACKGROUND

A&D was awarded an Indefinite Delivery-Indefinite Quantity (IDIQ) contract with the General Services Administration (GSA) on March 15, 2004. Administrative Record (AR) Tab 1 at 2. Contract No. GS-09P-03-KSD-0195 (master contract) authorized A&D to engage in "Repair and Alterations, Renovations and other Construction Related Services" in Arizona, Nevada and/or California, for a minimum of $1000 per contract year and for an estimated

maximum of $50,000,000. The master contract was for one base year and four option years.

The master contract referenced "each individual task order issued against the contract" for time of performance and other particulars. AR Tab 1 at 1. The contract informed A&D that "multiple awardees" might be considered for each task order. *Id.* at 43. When choosing a contractor from multiple awardees of master contracts for a particular task order contract, GSA was to follow the "fair opportunity" standard of Federal Acquisition Regulations System (FAR) 16.505(b), 48 C.F.R. § 16.505(b) (2005), and the general provisions of FAR 16.505(a), 48 C.F.R. § 16.505(a) (2005).[2] AR Tab 1 at 43. When GSA was preparing to compete the task order at issue here, a GSA official noted a lack of "fair opportunity" competition language in the draft acquisition plan, and alerted the plan authors of the required competition procedure mandated by FAR 16.505(b). *See id.* Tab 4 at 2 (email by Veronica L. Hennessey) ("This plan does not make any mention of the fact that you are required to give 'fair opportunity' to all IDIQ contractors. If you intend to give fair opportunity to all of them, add the phrase . . . 'Fair opportunity will be satisfied in accordance with FAR 16.505(b).'").

The acquisition plan to replace the fire alarm system for the Chet Holifield Federal Building in Laguna Niguel, California, known as Project RCA 13863 (the project), stated that "[t]here are seven Design-Build contractors on the list for the Tier 2, Zone 5 project, providing more than adequate opportunity for competition within the IDIQ framework." *Id.* at 7. The plan also stated that the "Required [performance] capabilities have been demonstrated by the IDIQ Design-Build contractors in the evaluation and award process of the master Regional IDIQ contract." *Id.* at 8. The acquisition plan required completion by August 15, 2007, because "[t]he existing fire alarm system is the original system installed . . . 35 years ago . . . [and] is obsolete and represents a risk to the building and its tenants." *Id.* at 7-8. The acquisition plan included the phrase "Fair opportunity will be satisfied in accordance with FAR 16.505(b)." *Id.* at 7. The acquisition plan also

---

[2]/ The court notes that the various sections of the FAR which were incorporated by reference into the master contract were found in the FAR published in 2003. There have been no substantive changes to the pertinent provisions of the regulations discussed in this opinion. Because renumbering has occurred in at least one instance, the court cites to the 2005 version of the FAR for ease of reference.

stated that the "[p]roject will be solicited in accordance with FAR parts 15 and 36" to comply with performance based contracting standards. *Id.* at 9. The projected acquisition plan approval date was October 28, 2005; actual approval was given on October 31, 2005.

The final specifications for the project's task order, identified by Contract No. GS-09P-98-KTD-0046, Delivery Order No. P-09-03-WP-0015, Project No. RCA 13863, were issued on November 4, 2005 and described the upcoming solicitation as a "negotiated lump sum bid project." AR Tab 5 at 1, 7. GSA memoranda issuing and modifying the request for proposals (RFP) for the project, apparently addressed to the seven Design/Build contractors, stated that the RFP process would "be based on Best Value and therefore be a technical proposal." *Id.* Tab 6 at 1 (Nov. 10, 2005), Tab 7 at 1 (Nov. 23, 2005), Tab 8 at 1 (Nov. 30, 2005), Tab 9 at 1 (Dec. 5, 2005). The final version of the RFP memorandum included the following information on the evaluation of bids for the project:

> I. It is the GSA's intent to award the work so set forth in the summary of work and as indicated in the drawings and specifications.
>
> II. The following Source Selection Factors will be utilized in determining the successful Contractor:
> 1. Price
> 2. Non-price factors:
>     a. Contractor/Subcontractor Qualifications
>     b. Installation Plan/phasing plan
>     c. Quality of Equipment and Materials
>
> All three non-price Source Selection Factors will carry equal weight and the Task Order RFP [bid] must contain responses to all three in order to be considered. GSA reserves the right to reject any bid that fails to respond to any of the three items.

AR Tab 9 at 16. The record shows that representatives of A&D and Hernandez attended the Pre-Proposal Meeting on November 10, 2005 at the Chet Holifield Federal Building. *Id.* at 18-19.

A&D submitted a proposal for the project on December 8, 2006, as did Hernandez. A&D's base bid[3] was priced at $1,494,044. Hernandez' base bid was priced at $1,503,670. A&D's total bid, including all optional work, was priced at $1,638,533. Hernandez' total bid, including all optional work, was priced at $1,738,144. Thus, A&D's bid was $99,611 less than Hernandez' bid, a savings to GSA of about 5.7% of the total value of the awarded contract, if the proposals had otherwise been equally rated. The government estimate for the project was $2,085,708.

In GSA's evaluation of the proposals for the project, five bids were reviewed, with A&D and Hernandez being the two lowest bidders. The evaluation factors were weighted 25% for price, 25% for past performance, and 50% for the other non-price factors. Specifically, the non-price factors, weighted 25% each, were "Contractor/Subcontractor Qualifications, Installation/Phasing Plan and Quality of Equipment and Materials." AR Tab 12 at 2. The evaluators stated that "[f]or this solicitation, technical quality is more important than price and as proposals become more equal in their technical merit, the evaluated price becomes more important." *Id.* When weighting had been applied to the price and non-price factor scores, A&D's score was ranked fourth of the five offerors. *Id.*

The evaluation team summarized the results of the scoring, reproduced here in relevant part:

> Since technical quality is considered more important than price and for the reasons above, Hernandez Construction was clearly found to be the most technically beneficial offeror. . . . The three remaining offerors [including A&D] had major deficiencies and/or omissions. Since the solicitation stipulated that award could be made without discussions and in the opinion of the evaluation team that discussions would not result in significant changes, with respect[] to the other offers, it is the

---

[3]/ In addition to the work covered in the base bid, offerors were asked to bid on four optional work projects in replacing fire alarm systems in small buildings or areas at the Chet Holifield Federal Building site. Thus, Option 1 was for the pump house, Option 2 was for the maintenance building, Option 3 was for the air conditioning plant building, and Option 4 was for the "NARA" space within the main building.

> determination of the evaluation team that the firm offering the greatest value to the Government is Hernandez Construction. Therefore, it is recommended by the team that Hernandez Construction be awarded the Fire Alarm Replacement Project.

*Id.* at 4.

Hernandez received award of the project, via contract GS-09P-03-KSD-0186, Delivery Order No. P-09-06-WP-0029, Project RCA 13863, on January 5, 2006 at its bid price of $1,738,144. The contracting officer signing the contract was Sheryl E. Leverette. The IDIQ contractors were notified of the award on January 9, 2005 by email from Brian Stilley, the Deputy Property Manager at GSA's Laguna office. A&D requested a debriefing on January 10, 2006, and Mr. Stilley responded on that date that he would call A&D after verifying Hernandez' payment and performance bonds. On January 26, 2006, Hernandez was issued a notice to proceed which stated that its bonds had been accepted and that work on the project must be completed within 540 days of January 27, 2006, or approximately by July 21, 2007.

A&D renewed its request for a debriefing on Wednesday, March 8, 2006. AR Tab 16 at 1. Mr. Stilley, on that same day, promised a call to A&D that week. *Id.* Mr. Stilley's email to A&D also mentioned that "I had left you a phone message," but it is unclear whether this message concerned A&D's request for a debriefing on the award to Hernandez, or was with regard to A&D's question about another contract solicitation. *See id.* Mr. Stilley held an informal phone debriefing with A&D sometime around March 17, 2006. AR Tab 17 at 3, Tab 18 at 1, Tab 21 at 4. On March 29, 2006, A&D requested a debriefing meeting with Ms. Leverette, the contracting officer, and she responded that day, offering a meeting on March 30, 2006. AR Tab 17 at 3. A&D requested a schedule change to March 31, 2006, to which Ms. Leverette acceded. *Id.* at 1-2.

At the formal debriefing, A&D presented a variety of arguments as to why the GSA evaluators had inaccurately scored its proposal for the project. AR Tab 18 at 1, Tab 21 at 4-6. As a result of the debriefing, GSA rescored A&D's proposal, primarily, it appears, changing the score regarding a key component of the fire alarm system proposed by A&D that had originally been judged to be incompatible with the main building's needs. AR Tab 18 at 1, Tab 19 at 2.

Because the component was indeed compatible, A&D, due to the rescoring, now placed fourth in non-price factors, and second overall when price and non-price factors were considered. AR Tab 18 at 1-2. Hernandez again scored first overall, and GSA informed A&D on April 25, 2006 that their "original decision regarding this procurement still stands." AR Tab 19 at 2.

A&D continued to communicate with GSA about the rescoring decision, which A&D complained was flawed. AR Tab 20, Tab 21. GSA conducted a review of the procurement and produced a document entitled "Conclusions," AR Tab 22 at 1, which considered many of A&D's arguments requesting further rescoring of A&D's proposal and rebutted them. AR Tab 22 at 1. GSA drafted a response to A&D's complaints on June 6, 2006 which asserted that "GSA has met all requirements for notification and debriefing for this project" and that "all laws and regulations have been followed" in the procurement for the project. *Id.* at 3. GSA also contacted the evaluation team and confirmed that the average non-price score for each bidder, corrected upward to reflect the rescoring in April, reflected a consensus of the evaluation team as to the proposals submitted by the five contractors. AR Tab 23 at 1-7. Defendant now asserts that during the procurement review process, even when equal weight, as opposed to 25% and 75%, was given to price and non-price factors, respectively, and even taking into account A&D's corrected technical score, Hernandez continued to provide the "best value" to the government.

On June 12, 2006, GSA informed A&D that GSA's "Procurement Review Group review[ed] the procurement to ensure that award was made to the proper contractor. They determined that the record supports the award decision, and that GSA evaluated the proposals in accordance with the factors set forth in the solicitation." AR Tab 25 at 3. A&D continued to complain that the procurement decision was flawed, and received an email on June 12, 2006 stating that no further response would be forthcoming from GSA. *Id.* at 1. Hernandez has completed the design of the replacement fire alarm system and commenced installation. GSA has made progress payments for approximately ten percent of the contract price. A&D filed its bid protest complaint in this court on June 20, 2006.

## DISCUSSION

### I. Standard of Review

**A. Motion to Dismiss for Lack of Jurisdiction**

The court's "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997) (citations omitted). Plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *Cubic Def. Sys., Inc. v. United States*, 45 Fed. Cl. 239, 245 (1999) (citing *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988); *Maniere v. United States*, 31 Fed. Cl. 410, 413 (1994)). If jurisdiction is found to be lacking, this court must dismiss the action. Rule 12(h)(3) of the Rules of the United States Court of Federal Claims (RCFC). In rendering a decision on a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), this court must presume all undisputed factual allegations to be true and construe all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814-15 (1982); *Reynolds*, 846 F.2d at 747.

As a threshold jurisdictional matter, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003). This may be accomplished by demonstrating that the plaintiff was an actual bidder and that it was prejudiced by the award to the successful offeror. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (*AFGE*)). Prejudice is proven by establishing that the plaintiff had a substantial chance of receiving the contract, but for the alleged procurement error. *Id.* (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).[4]

---

[4]/ This first showing of prejudice to the protestor, in order to prove standing, must occur before reaching the merits of the bid protest review. *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (stating that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits"). The Federal Circuit has also stated that the two-step review of contract awards begins with an "arbitrary and capricious" review of an award and then proceeds to the issue of prejudice to the protestor. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). This court thus looks twice at prejudice, first weighing prejudice as it pertains to standing, and then more thoroughly weighing prejudice to determine whether plaintiff shall be (continued...)

## B. Motion for Judgment on the Administrative Record

RCFC 52.1 provides for judgment on the administrative record.[5] To review a motion, or cross-motions, under RCFC 52.1, the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The court must make fact findings where necessary. *Id.* The resolution of RCFC 52.1 cross-motions is akin to an expedited trial on the paper record. *Id.*

## C. Bid Protests

As the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2000)]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (*Banknote*) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)); *see also* 28 U.S.C. § 1491(b) (2000) (describing this court's bid protest jurisdiction). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a violation of regulation or procedure. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted). *De minimis* errors in the procurement process, however, do not justify relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996). The plaintiff bears the burden of proving the

---

[4](...continued)
afforded relief. *See Night Vision Corp. v. United States*, 68 Fed. Cl. 368, 392 & n.23 (2005) (characterizing the prejudice determination for standing purposes as a "limited review for prejudice," seeking "minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing"). Standing is an element of this court's jurisdiction over bid protest cases. *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307-08 (Fed. Cir. 2006) (upholding a dismissal for lack of jurisdiction because the protestor was not an actual bidder on the disputed contract award and could not show prejudice, *i.e.*, that it had a substantial chance of receiving the contract but for the alleged procurement errors).

[5]/ The rule governing procedure for motions for judgment on the administrative record was formerly numbered RCFC 56.1, until June 20, 2006. The substantive nature of the review of such motions was not changed when the rule was moved to RCFC 52.1.

arbitrary and capricious nature of the award. *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)).

The higher the degree of discretion allotted the contracting officer, the more difficult it is for a protestor to prove that the procurement decision was arbitrary and capricious. *Burroughs Corp. v. United States*, 617 F.2d 590, 597 (Ct. Cl. 1980) (citing *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1204 (Ct. Cl. 1974)). Negotiated procurements give a "breadth of discretion" to the contracting officer, and impose a heavier burden of proof on a protestor. *Id.* at 598 (citing *Keco*, 492 F.2d at 1204). Similarly, "best value" contract awards give a contracting officer more discretion than awards based on price alone. *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)). Thus, the protestor's burden is especially heavy in negotiated, best value procurements. *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 380 (2003) (citations omitted), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). If, on the other hand, "the trial court determines . . . the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] . . . it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. If a protestor can show that, but for the procurement error of the agency, there was a substantial chance that it would have won the contract award, prejudice has been established. *Id.* at 1353. "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts*, 216 F.3d at 1057).

### D. Temporary Restraining Orders, Preliminary Injunctions and Declaratory Judgments

The court must weigh four factors before granting a temporary restraining order or a preliminary injunction:

> (1) immediate and irreparable injury to the movant; (2) the movant's likelihood of success on the merits; (3) the public interest; and (4) the balance of hardship on all the parties.

*United States Ass'n of Importers of Textiles & Apparel v. United States Dep't of Commerce*, 413 F.3d 1344, 1346 (Fed. Cir. 2005) (citing *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983)); *W & D Ships Deck Works, Inc. v. United States*, 39 Fed. Cl. 638, 647 (1997) (stating that "the same four-part test applied to motions for a preliminary injunction" applies to motions for a temporary restraining order). A permanent injunction against a contract award may issue, after consideration of the same four factors, except that plaintiff must show actual success on the merits, instead of likelihood of success, to win a permanent injunction. *PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 532, 546 n.12 (1987)). In the bid protest context, a request for relief in the form of a declaratory judgment may be, by its nature, a request for a permanent injunction of a contract award; this request is properly reviewed under the injunctive standard.[6] *Id.* at 1228 (citations omitted).

## II. Analysis

### A. Jurisdiction

#### 1. Bar on Protests of Individual Task Orders for Multiple Award IDIQ Contracts

Congress passed the Federal Acquisition Streamlining Act of 1994 (FASA), Pub. L. No. 103-355, 108 Stat. 3243 (1994), in an effort to reform federal procurement activities "by greatly streamlining and simplifying [the federal government's] buying practices." 140 Cong. Rec. H9240, H9240 (1994) (statement of Rep. Conyers). In the interest of efficiency, bid protests were targeted by FASA as one of the areas in need of reform: "The revised contracting procedures and the new, accelerated notice of contract awards, contract

---

[6]/ Indeed, in plaintiff's motion for judgment on the administrative record, plaintiff requests relief in the nature of a permanent injunction. Pl.'s Mot. at 25-26.

debriefings, and bid protests are all designed to reduce staff time, lessen the amount of paperwork required, and shrink the bureaucracy." *Id.* at H9245 (statement of Rep. Harman). In particular, when a procurement envisioned a multiple award IDIQ contract, creating, through competition, a pool of contractors for certain work projects, the issuance of individual task orders to these contractors would not be subject to protests. Pub. L. No. 103-355, § 1054 (now codified at 41 U.S.C. § 253j(d) (2000)). The bar on protests of individual task orders states that "[a] protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued." 41 U.S.C. § 253j(d). The Section 253j(d) bar on protests of task orders has not been much tested in this court, and bears some discussion.[7]

**a. The Bar on Bid Protests was Intended to Bar Bid Protests in this Court**

FASA is silent as to whether the language "[a] protest is not authorized" in Section 253j(d) refers to a bid protest in the United States Court of Federal Claims. This court has twice discussed Section 253j(d)'s bid protest bar as a general matter. First, in *Labat-Anderson Inc. v. United States*, 50 Fed. Cl. 99 (2001), the court acknowledged, before it took jurisdiction over the protest of a GSA award of a Blanket Purchase Agreement (BPA) under the Federal Supply Schedule (FSS), that "the plain language of the statutory provision [Section 253j(d)] clearly bars task order protests." *Id.* at 104. The court nonetheless concluded that Section 253j(d)'s bid protest bar "was not intended to apply to [Federal Supply Schedule] procurements," for reasons not relevant here. *Id.* at 105. The court noted that "FASA's legislative history . . . does not shed meaningful light on the scope of the

---

[7]/ This court has jurisdiction over task order protests when they fit squarely into one of the exceptions enumerated in 41 U.S.C. § 253j(d), such as when a task order is alleged to be at variance with the scope of the master IDIQ contract. *See, e.g., Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 445, 455 (2001) (accepting jurisdiction over a protest which alleged that the issued task order incorporated "changes . . . outside the scope of the original competition"); *see also Phoenix Air Group, Inc. v. United States*, 46 Fed. Cl. 90, 105 (2000) (accepting jurisdiction over "the government's contested procurements . . . [via task orders which] must be examined with an eye toward the scope of the [IDIQ] Contract") (citing 10 U.S.C. § 2304c(d), the military procurement equivalent of 41 U.S.C. § 253j(d)). None of Section 253j(d)'s enumerated exceptions is at issue here.

task order protest bar." *Id.* In sum, the court in *Labat* opined that Section 253j(d) would bar bid protests in this court for task orders on multiple award IDIQ contracts, but not BPA awards under the FSS. *See id.* at 104 (stating that "the award at issue in [*Labat*] constitutes far more than the mere issuance of a task order against an already-existing GSA FSS or multiple-award contract").

Last year, the court revisited Section 253j(d)'s bid protest bar in *Group Seven Assocs., LLC v. United States*, 68 Fed. Cl. 28 (2005). The court noted the broad, clear language of the bar on bid protests of task orders: "The statutory language [of Section 253j(d)], moreover, does not suggest any exceptions." *Id.* at 32. The *Group Seven* case again dealt with an FSS award, this time of a task order, not a Blanket Purchase Agreement. *Id.* Noting the differences with the *Labat* case, and finding the *Labat* reasoning for exempting FSS task orders from Section 253j(d)'s bid protest bar "less than compelling," the court concluded that this court's "jurisdiction[] is doubtful" over a task order protest, even if the task order is an FSS task order. *Id.* Nonetheless, the court proceeded, "given the *Labat-Anderson* decision and the intervenor's reluctance to rely on [*Labat*], [to] assume that jurisdiction attaches and [went] on to the merits of the case." *Id.* The complaint in *Group Seven* was dismissed on other grounds. *Id.* at 33. Thus the *Group Seven* court also opined that Section 253j(d)'s bid protest bar on task order awards normally defeats jurisdiction in this court.

The court finds no reason to disagree with the analysis of Section 253j(d)'s bid protest bar in *Labat* and *Group Seven*, as it applies to task orders on multiple award IDIQ contracts. This court cannot frustrate the intent of Congress, which was to exempt from protest the issuance of individual task orders to contractors who had already received awards, subject to protest, of their master IDIQ contracts. In the place of agency protests, Government Accountability Office (GAO) protests or judicial review, Congress saw fit to offer disappointed task order bidders recourse to the agency's task and delivery order ombudsman. 41 U.S.C. § 253j(e) (2000); 48 C.F.R. § 16.505(b)(5).

**b. Subsequent Legislation Has Not Overruled the Task Order Bid Protest Bar**

This court's bid protest jurisdiction was expanded by the enactment of the Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, 110 Stat. 3870 (1996) (codified in relevant part at 28 U.S.C. § 1491(b)(1)). *AFGE*,

258 F.3d at 1300. Nothing in ADRA explicitly discusses or revokes the applicability of 41 U.S.C. § 253j(d) to this court. Nor has the court found any indication in the legislative history of ADRA that Congress wished to revoke its streamlining of federal procurements so as to permit greater judicial review of task order awards. Absent any indication of ADRA's repeal of the applicability of Section 253j(d) to this court, the court cannot read ADRA's general grant of bid protest jurisdiction as repealing FASA's specific task order bid protest bar. *See Inter-Coastal Xpress, Inc. v. United States*, 296 F.3d 1357, 1366 (Fed. Cir. 2002) (holding that an earlier specific statute trumps a later, more general one) (citations omitted). Repeal by implication is strongly disfavored and should "occur 'only when an enactment is irreconcilable with an earlier statute, or the enactment so comprehensively covers the subject matter of the earlier statute that it must have been intended as a substitute.'" *Id.* at 1370 (quoting *Todd v. Merit Sys. Prot. Bd.*, 55 F.3d 1574, 1577 (Fed. Cir. 1995)). When faced with a different question as to the breadth of the expanded bid protest jurisdiction afforded this court by ADRA, the Federal Circuit adhered to "the principle that waivers of sovereign immunity, such as that set forth in § 1491(b)(1), are to be construed narrowly." *AFGE*, 258 F.3d at 1301 (citing *McMahon v. United States*, 342 U.S. 25, 27 (1951)). Following this guidance, the court understands that ADRA expanded this court's bid protest jurisdiction but left intact the bar against a specific type of bid protest, the protest of the issuance of a task order on a multiple award IDIQ contract not alleging any of the exceptions enumerated in Section 253j(d).[8]

**c. A&D's Master Contract Incorporated the Task Order Bid Protest Bar**

A&D's master contract incorporated by reference both FAR 16.505(a)(9), 48 C.F.R. § 16.505(a)(9), and FAR 16.505(b)(5), 48 C.F.R. § 16.505(b)(5). AR Tab 1 at 43 ("FAR 16.505 Ordering (a) & (b) is incorporated by reference, and is an integral part of the subject contract(s)."). FAR 16.505(a)(9) references 41 U.S.C. §

---

[8]/ This court recently reviewed its expanded jurisdiction under ADRA and under quite different circumstances took jurisdiction over a protest of a later stage of competition in a multiple award contract. *OTI Am., Inc. v. United States*, 68 Fed. Cl. 108, 114-17 (2005). It does not appear that Section 253j(d) was argued or was applicable in that case.

253j(d), the statutory bar on task order bid protests.[9] 48 C.F.R. § 16.505(a)(9). FAR 16.505(b)(5) states that the agency "ombudsman must review complaints from contractors and ensure they are afforded a fair opportunity to be considered [for a task order], consistent with the procedures in the [master] contract." 48 C.F.R. § 16.505(b)(5). Taken together, these FAR provisions give contractors notice of the appeal procedures available to them when they are the disappointed bidders for a task order that is part of a multiple award IDIQ contract, and that jurisdiction does not lie in this court for a task order bid protest when the enumerated exceptions listed in Section 253j(d) do not apply.

#### d. No Other Basis for Jurisdiction Exists for the Bid Protest of a Task Order on a Multiple Award IDIQ Contract

Although plaintiff has not alleged jurisdiction under any authority other than 28 U.S.C. § 1491(b), the court has also considered whether this court's jurisdiction under the Contract Disputes Act of 1978 (CDA) and the Tucker Act, codified at 41 U.S.C. § 609(a)(1) (2000) and 28 U.S.C. § 1491(a)(2) (2000) respectively, would allow this court to reach the merits of this case. First, the court reads the task order bid protest bar of 41 U.S.C. § 253j(d) to squarely deny the right of plaintiff to contest, in this court, the project's award to intervenor-defendant. Second, as a general matter, the court does not agree with the theory that actions, that are in essence bid protests of task order awards, can be re-characterized as contract disputes in order to create jurisdiction in this court or in an agency board of contract appeals. *But see* Ralph C. Nash & John Cibinic, *Task Order Contracts: The Breach of Loss of the Fair Opportunity to Compete*, 16 No. 10 Nash & Cibinic Report 49 (Oct. 2002) ("Taking a case to the agency board of contract appeals

---

[9]/ The regulation does not explicitly reproduce the total breadth of the bid protest bar, because it directly discusses only the bar on protests filed with the agency or GAO. 48 C.F.R. § 16.505(a)(9) ("No protest under subpart 33.1 [of the FAR, encompassing agency and GAO protests] is authorized in connection with the issuance or proposed issuance of an order under a task-order contract or delivery-order contract, except for a protest on the grounds that the order increases the scope, period, or maximum value of the contract (10 U.S.C. 2304c(d) and 41 U.S.C. 253j(d))."). Thus, it is only the reference to 41 U.S.C. § 253j(d) in FAR 16.505(a)(9) that incorporates into A&D's master contract FASA's task order bid protest bar as it applies to protests brought in this court.

appears to be a viable way to contest the lack of a fair opportunity to compete for task orders."). Such a stratagem attempts to evade the bar of task order bid protests clearly enunciated in Section 253j(d). *But see Cmty. Consulting Int'l*, ASBCA 53489, 02-2 BCA ¶ 31940 (Aug. 2, 2002) (finding that a contract clause assuring a fair opportunity to compete for task orders gave the board jurisdiction, and finding no indication in FASA that "Congress explicitly carved out multiple award, task order contracts as an exception to [the board's] Contract Disputes Act jurisdiction"). The court does not find that this type of bid protest action would fall within its CDA jurisdiction.

Even assuming CDA jurisdiction would lie for this suit, plaintiff has not alleged that a contract claim has been presented to the contracting officer. Failure to present a contract claim for a sum certain to the contracting officer prevents this court from taking jurisdiction over a CDA claim. *See Davis/HRGM Joint Venture v. United States*, 50 Fed. Cl. 539, 545 (2001) (declining jurisdiction over a contract claim filed as a bid protest because plaintiff had not filed a claim with the contracting officer prior to filing suit in this court); *RCS Enters., Inc. v. United States*, 46 Fed. Cl. 509, 515 (2000) (stating that because "plaintiff ha[d] presented no monetary claim . . . for a sum certain, the court cannot exercise [CDA] jurisdiction") (citing *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed. Cir. 1995) (en banc)). For these reasons, the CDA does not permit this suit to proceed in this court.

#### e. Task Order Contracts for Construction May Be Issued Pursuant to FAR 16.505

Plaintiff asserted at oral argument for the first time that the master IDIQ contract and the task order at issue here were for construction services, and as such, FAR 16.505 could not apply because this section of the FAR applies only to services and supplies, not construction. Oral Argument Transcript (Tr.) at 12, 27. Defendant responded first that if plaintiff objects to the master contract here on the basis that it impermissibly incorporated FAR 16.505, this objection is not timely and should have been protested much earlier in this procurement process. Tr. at 57. Defendant also disagrees with plaintiff's assertion that this is a construction contract. *Id.* at 58. Plaintiff cited no precedential authority for its theory that FAR 16.505 categorically never applies to construction contracts.

The court agrees that the shorthand references throughout the master contract do indeed employ the word "construction" to describe the solicitation and award of the regional IDIQ contract to A&D (and presumably to the six other contractors awarded similar master contracts ). *See* AR Tab 1 at 2 ("Item(s) Accepted" block referring to "IDIQ Construction Contract, Tier 2"). The fuller description of the services encompassed by the master contract is found on the notice page of the solicitation of the master contract, as incorporated into the master contract: "Indefinite Delivery - Indefinite Quantity (IDIQ) Contract for Repair and Alterations, Renovations and other Construction Related Services." *Id.* at 7. Thus, the master contract is perhaps most properly described as a contract for construction-related services. But the distinction is not material.

There does not appear to be any impediment to using supplies and services IDIQ contracts, described by FAR subpart 16.5, *see* 48 C.F.R. §§ 16.504, 16.505 (2005), for contracts which are specifically for construction services or construction-related services. *See Abatement Contracting Corp. v. United States*, 58 Fed. Cl. 594, 595, 604 (2003) (analyzing a dispute over an IDIQ services contract for asbestos removal and insulation installation pursuant to the principles enunciated in FAR 16.504); *Schweiger Constr. Co. v. United States*, 49 Fed. Cl. 188, 190, 194 (2001) (analyzing a contract for "construction services in GSA owned or leased buildings" pursuant to the principles of FAR 16.504); *see also* 48 C.F.R. § 36.101(a) (2005) ("Construction and architect-engineer contracts are subject to the requirements in other parts of [the FAR], which shall be followed when applicable."). The court has found no caselaw forbidding the government from using the IDIQ supplies and services contracting vehicle described in FAR 16.504 and 16.505 in the construction context.

FASA permits IDIQ contracting for "procurement of services or property," Pub. L. No. 103-355, § 1054(a) (codified at 41 U.S.C. § 253h(a) (2000)), and is silent as to whether construction services or construction-related services constitute "services" under FASA. The federal government was already using IDIQ contracts in the construction arena by the time FASA was passed. *See* Denise Farris, *Checking Your Indefinite Delivery/Indefinite Quantity (IDIQ) IQ*, 22-Fall Construction Law 24 (2002) ("ID[IQ] contracts have been used routinely and effectively by the [the United States Department of Defense] for installation maintenance, minor repair, and construction projects since [IDIQ's] inception in

1981.”). FASA does not appear to exclude construction services or construction-related services task order contracts from the general category of task order contracts for services.

The court has found no statutory or regulatory requirement which precludes FAR 16.505(a)(9) from applying to construction services or construction-related services contracts. For these reasons, the court rejects plaintiff’s argument that FAR 16.505 cannot apply to this master contract and task order award, despite its incorporation by reference into the master contract.[10] The court need not consider whether the master contract is indeed a construction contract, or whether plaintiff’s challenge to the incorporation of FAR 16.505 in the master contract and the task order is untimely.

### 2. No Standing for an Offeror Whose Bid Did Not Include a Bid Bond

Defendant urges a second jurisdictional argument: A&D lacks standing for this bid protest because its failure to properly submit a bid bond rendered its bid nonresponsive. Def.’s Mot. at 15-18. The court will first review the facts pertinent to A&D’s bid and the bid bond requirement. The court will then consider whether, under pertinent law and regulation, A&D had standing to bring this bid protest.

The solicitation for the project included a requirement for a bid bond, sometimes referred to as a bid guarantee. The specific solicitation language mandating the submission of a bid bond by offerors was as follows: “Bid Bond: Require[sic] for 20% of contract value.” AR Tab 9 at 1. The solicitation required that proposals be submitted by mail or hand-delivery, and stated that “Facsimile or e-mail submission are not permitted.” *Id.* The master contract incorporated by reference FAR 52.228-1 (Variation), AR Tab 1 at 16, which states in relevant part that “[f]ailure to furnish a bid guarantee in the proper form and amount, by the time set for opening of bids, may be cause for rejection of the bid.” 48 C.F.R. § 52.228-1(a) (2005). FAR 52.228-1 references FAR 28.101-2, which mandates bid

---

[10]/ For the same reasons, the court would reject an argument that 41 U.S.C. § 253j(d) does not apply to construction services or construction-related services task order contracts.

guarantee solicitation clauses for contracts where bid guarantees are required. 48 C.F.R. § 28.101-2(a) (2005). A nearby FAR provision, FAR 28.101-4(b), states that noncompliance with bid guarantee requirements must lead to rejection of bids, in certain circumstances. 48 C.F.R. § 28.101-4(b) (2005).[11]

A&D's bid, as reproduced in the administrative record, contains no bid bond. AR Tab 10. There is circumstantial evidence[12] that if A&D did deliver a bid bond to GSA, A&D did so by facsimile. Pl.'s Mot. Att. 1 ¶ 8 (Declaration of James Ballow) ("It was my understanding that the GSA had accepted, evaluated, scored and rescored A&D's proposal with the knowledge that A&D had faxed its bid bond . . . ."); AR Tab 18 at 1 (debriefing notes by GSA's Brian Stilley dated April 10, 2006) ("GSA does not have record of receiving a bid bond from A and D with this proposal. A and D insisted that one was faxed the day bids were due. However, the RFP states that Facsimile or e-mail submissions are not permitted."). A&D learned that GSA did not have A&D's bid bond on file by the time of the March 31, 2006 debriefing. *See* AR Tab 18 at 1 (GSA minutes of March 31, 2006 debriefing); Pl.'s Reply Att. 1 ¶ 4 (Declaration of James Ballow) ("At no time during the debriefing of March 31, 2006 was it mentioned or discussed that A&D's bid bond was an issue or cause for A&D not receiving the award of this project. . . . At no time during the 7 months after A&D submitted its proposal did the GSA issue a notice that the proposal had been rejected or returned due to an issue with A&D's bid bond being faxed in."); Pl.'s Counter to Def.'s Facts ¶ 38 ("The meeting of March 31, 2006 was the first time A&D learned that GSA had any concerns about a facsimile bid bond. Ms. Leverette simply advised A&D that GSA did not have a bid bond on file. Mr. Ballow responded that one had been faxed on the day A&D submitted its proposal."). Plaintiff has presented no evidence which

---

[11]/ The applicability of these FAR sections will be discussed *infra* note 13.

[12]/ Defendant's Motion to Strike Declaration of James Ballow Submitted with Plaintiff's Motion for Judgment upon the Administrative Record asked the court to strike some of the circumstantial evidence cited here. The administrative record is devoid of indicia as to whether GSA received a facsimile bid bond from A&D, or whether GSA notified A&D of the missing or inadequate bid bond before March 31, 2006. "Supplementation of the record is . . . allowed in limited circumstances where the record is insufficient for the court to render a decision." *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 105 (2004) (citing *Impresa Construzioni*, 238 F.3d at 1338-39). The contested declaration supplements the insufficient record in this case, and therefore defendant's motion to strike is denied.

substantiates that A&D did indeed fax a bid bond to GSA on December 8, 2005.

If A&D submitted no bid bond, whether by facsimile or by mail or hand-delivery, A&D's bid must be considered nonresponsive. *See, e.g., Harris Excavating*, B-284,820, 2000 CPD ¶ 103 (Comp. Gen. June 12, 2000) ("When required by a solicitation, a bid guarantee is a material part of the bid and must be furnished with it.") (citations omitted); *To The Heads of Dep'ts, Indep. Establishments, Agencies, and Others Concerned: Contracts - Bid Bond Requirement - Noncompliance Necessitating Rejection*, 38 Comp. Gen. 532, B-137,319, 1959 CPD ¶ 10 (Feb. 5, 1959) ("It cannot be questioned that the furnishing of a bid bond is reasonably related to the purposes of a procurement, and it is a proper exercise of administrative judgment to determine whether or not bid bonds are needed in a particular case. For the reasons stated above, we believe that where such a determination has been made and the invitation requires a bid bond, that requirement becomes a material part of the invitation, noncompliance with which renders a bid nonresponsive."). A bidder submitting a nonresponsive bid has no standing to protest an award, because it has no chance of receiving the award. *See AFGE*, 258 F.3d at 1302 ("We therefore construe the term 'interested party' in § 1491(b)(1) . . . and hold that standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."); *CHE Consulting, Inc. v. United States*, 47 Fed. Cl. 331, 337 (2000) ("A nonresponsive bidder is not an interested party.") (citing *Ryan Co. v. United States*, 43 Fed. Cl. 646, 656 (1999)).

Even if A&D had submitted its bid bond by mail or hand-delivery, a facsimile or photocopy of the bid bond would not normally have been an adequate substitute for an original bond and A&D's bid would still have been nonresponsive.[13] *See, e.g., R.P. Richards, Inc.*, B-272,430, 96-2 CPD ¶ 138

---

[13]/ As previously stated, a bid bond for the project was required by FAR 52.228-1. AR Tab 1 at 16. This regulation states that "[f]ailure to furnish a bid guarantee in the proper form and amount, by the time set for opening of bids, may be cause for rejection of the bid." 48 C.F.R. § 52.228-1. Defective bid bonds may be corrected under certain circumstances prescribed by FAR 28.101-4(b), which in turn depends on FAR 15.306(a)(2) for guidance as to which circumstances permit correction of defective bid bonds. 48 C.F.R. § 28.101-4(b).

(continued...)

(Comp. Gen. Oct. 8, 1996) ("Facsimile copies of bid bonds generally do not satisfy the requirement for a bid guarantee because there is no way for the contracting agency to be certain from examining a copy–other than by referring to the original after bid opening–whether the original has been altered without the surety's knowledge or consent."); *see also Collins Cos.*, B-274,765, 96-2 CPD ¶ 243 (Comp. Gen. Dec. 27, 1996) (stating that "when a bidder submits a defective bid bond, the bid itself is rendered defective and must be rejected as nonresponsive"); *Global Eng'g*, B-250,558, 93-1 CPD ¶ 31 (Comp. Gen. Jan. 11, 1993) (stating that FAR 52.228-1 "does not . . . give the contracting officer blanket discretion to waive inadequate bid guarantees"). But here, the court must decide two different questions: whether plaintiff has shown that A&D submitted a faxed bid bond on the day that bids were due, and if so, whether a faxed submission of a bid bond was responsive to the task order solicitation.

GAO has considered protests by disappointed bidders who allege that they submitted required bid materials that are later not to be found in the record maintained by the procuring agency. GAO generally requires "independent evidence establishing the validity of the bidder's assertion." *E.g.*, *Zolman Constr. & Dev., Inc.*, B-247,117, 92-1 CPD ¶ 284 (Comp. Gen. Mar. 13, 1992). However, many of these GAO decisions turn on the agency's evidence that a material element of a bid was missing. *See, e.g.*, *id.* Here, there is no sworn testimony from

---

[13](...continued)

Task orders issued pursuant to FAR 16.505(b), as is the case here, are not subject to the *policies* in FAR subpart 15.3, the subpart which includes FAR 15.306(a)(2). *See* 48 C.F.R. § 16.505(b)(1)(ii). However, procedural elements of subpart 15.3 are still operative for FAR 16.505(b) solicitations. *Id.* Thus, if A&D had timely mailed or hand-delivered a facsimile bid bond to GSA, utilizing a submission method approved by the solicitation, and if the bid bond thus submitted was arguably merely defective and subject to correction by means prescribed by FAR 15.306(a)(2), 48 C.F.R. § 15.306(a)(2) (2005), the court would have been required to review the circumstances of the solicitation to see if the defect could have been cured.

This review would have examined whether or not GSA could have awarded the task order without giving A&D an opportunity to supply an original copy of its bid bond, to determine whether A&D's bid would, in those circumstances, *necessarily* have been rejected. If A&D's mailed or hand-delivered facsimile bid bond would necessarily have been rejected as nonresponsive, A&D would have lacked standing to bring a bid protest. If A&D's mailed or hand-delivered facsimile bid bond might have been subject to correction, on the other hand, A&D's standing to bring a bid protest would have been unaffected by the bid bond issue.

GSA *or* A&D concerning whether or not a faxed bid bond was sent from A&D to GSA before the bid deadline. Although the record does not support A&D's assertion that a faxed bid bond was timely sent to GSA, there is a similar lack of evidence from GSA showing that no faxed bid bond was received by them.

Standing is an element of this court's jurisdiction over bid protests. *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (stating that "standing is a threshold jurisdictional issue") (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-04 (1998)). The disappointed bidder must show that it had a substantial chance of receiving the award, but for the alleged procurement errors. *Id.* at 1370. In short, plaintiff bears the burden of showing that it was a qualified bidder. *Id.* at 1370-71. The record does not show that a bid bond was received by GSA, and defendant disputes that A&D's proposal was accompanied by a bid bond. *See* Def.'s Facts ¶¶ 18, 38. Plaintiff has not met its burden of showing that it was a qualified bidder on the project, because the record before the court does not contain any evidence that A&D submitted a faxed bid bond.

Even if plaintiff had shown that A&D faxed a bid bond to GSA on December 8, 2006, this faxed submission would have violated the submission terms of the solicitation itself. Submission of proposals by facsimile was not permitted by the solicitation. AR Tab 9 at 1. Proposals submitted by means forbidden by a solicitation's terms must be rejected, because they are nonresponsive. *See, e.g.*, *Integrated Bus. Solutions, Inc.*, B-292,239, 2003 CPD ¶ 122 (Comp. Gen. July 9, 2003) (upholding the rejection of a proposal sent by email because email transmission was not permitted by the solicitation); *G.D. Searle & Co.*, B-247,077, B-247,146, 92-1 CPD ¶ 406 (Comp. Gen. Apr. 30, 1992) (upholding the rejection of a proposal sent by facsimile because facsimile transmission was not permitted by the solicitation). Although plaintiff asserts that the solicitation could be read to bar facsimile submission of everything else submitted in the proposal but not the bid bond, Pl.'s Reply at 4, this reading of the solicitation is strained and illogical. *See* AR Tab 9 at 1. The paragraph listing submission guidelines is titled "Proposals due by:" and includes the time and date deadline, the address reference, the bar on facsimile transmission and the requirement of a mailed or hand-delivered sealed envelope containing the proposal. *Id.* A later, separate paragraph titled "Bid Bond:" indicates the requirement for a

bid guarantee in the amount of twenty percent of the bid price and mentions no submission guidelines whatsoever. *Id.*

The only plausible reading of the solicitation document as a whole is that all materials a bidder was required to submit on December 8, 2006, including the bid bond, had to be hand-delivered or mailed according to the terms of the "Proposals due by:" paragraph. Otherwise, where would the bidder send the bid bond? By when? The only instruction bidders received as to what to do with their bid bonds was found in the "Proposals due by:" paragraph. Therefore, all of the terms of the submission guidelines found in that paragraph, not just the time, date and address terms, applied to the bid bond. *See Banknote*, 365 F.3d at 1353 (stating that a court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions") (citing *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc)). This means the bar on facsimile transmission also applied to the bid bond.

All bid materials due on December 8, 2006, including the bid bond, were not permitted to be sent be facsimile.[14] If A&D did fax a bid bond to GSA on December 8, 2006 before the proposal deadline, that bond would necessarily have been rejected. Thus, even if A&D did fax a bid bond to GSA, A&D's bid was nonresponsive for lack of a bid bond.

It is of no consequence that A&D's bid appears to have been scored by GSA, and even re-scored later, as a potential awardee for the project. Even where an agency has awarded a contract, the successful bidder may lose the contract if its bid bond is found to be defective during subsequent protest proceedings. *Hugo Key & Son, Inc.; Alco Envtl. Servs., Inc.*, B-251,053, B-251,053.4, B-251,053.5,

---

[14]/ Bid bonds are normally required to be submitted as original documents, rather than in photocopy or facsimile form. *See Jay-Brant Gen. Contractors*, B-274,986, 97-1 CPD ¶ 17 (Comp. Gen. Jan. 10, 1997). This is to assure that the surety will not be able to defend against enforcement of the bond in the possession of the contracting officer by claiming that alterations of the original bond have occurred. *Id.* (citations omitted). GAO "consistently denie[s] protests filed by bidders who submitted facsimile copies of their bid bonds in lieu of the original documents." *Global Eng'g*, B-250,558, 93-1 CPD ¶ 31 (Comp. Gen. Jan. 11, 1993). Plaintiff's reading of the solicitation, to allow a bid bond which according to GAO precedent does not bind the surety, is not plausible, and the court, in this instance, will be guided by GAO precedent.

93-2 CPD ¶ 21 (Comp. Gen. July 15, 1993). A nonresponsive bid, made nonresponsive by a defective bid bond, denies standing to a protestor, regardless of the protestor's prior ranking in a competition for a contract award. *Id.* A&D cannot excuse its failure to properly submit a bid bond by the agency's lack of diligence in removing a nonresponsive bid from consideration. A&D did not stand a substantial chance of being awarded the task order complained of here, either because it submitted no bid bond with its proposal, or, in the alternative, because it faxed a bid bond in contravention of the terms of the solicitation. A&D therefore lacks standing to bring this bid protest.

**B. Relief**

The court does not have jurisdiction over this bid protest due to the operation of 41 U.S.C. § 253j(d) and plaintiff's lack of standing. The court need not reach the parties' arguments for judgment on the administrative record, or their arguments regarding the appropriateness of injunctive relief in these circumstances. The merits of those arguments are beyond this court's review.

The court remains troubled, however, that the irregularities in the solicitation of this task order are not subject to protests here, at GAO or at GSA. The streamlining of federal procurements allowed by the ban on protests of task order contracts may be abused when the principles of fair competition are subverted. *See* 140 Cong. Rec. H9240, H9241 (1994) (statement of Rep. Conyers) ("I am proud of the fact that [FASA] makes these [streamlining] reforms without undermining key features of the current procurement statutes that protect the taxpayers. These features, such as full and open competition, help drive down costs."). Task order contracting is to be, by statute and by regulation, fairly administered. *See* 41 U.S.C. § 253j(b) (2000) ("When multiple contracts are awarded . . . , all contractors awarded such contracts shall be provided a fair opportunity to be considered, pursuant to procedures set forth in the contracts . . . ."); 48 C.F.R. § 16.505(b)(1)(ii)(B) ("[The contracting officer must] [n]ot use any method . . . that would not result in fair consideration being given to all awardees prior to placing each order . . . .").

The court is not confident that the procedures developed and implemented

by GSA for soliciting and awarding this project furthered FASA's goal of balancing efficiency with competition, and simplicity with fairness. For example, despite the assertion contained in the GSA award report that the solicitation stipulated that award could be made without discussions, bidders on the project were not informed whether or not award could be made without discussions; nor were they informed as to the weight of price and non-price evaluation factors. The sample task order RFP form included in the master contract indicated that if both types of factors were to be considered in a task order RFP, approximately equal weight would be given to price and non-price factors. AR Tab 1 at 239. GSA, instead, gave non-price factors three times the weight of the price factor. Thus, it appears that the guiding competition principles and procedures set forth in 41 U.S.C. § 253j(b), FAR 15.209(a), 48 C.F.R. § 15.209(a) (2005), and FAR 15.304(e), 48 C.F.R. § 15.304(e) (2005), were ignored in competing this task order.

Similarly, the "fair consideration" to be offered to bidders such as A&D appears to have been impaired. *See* 48 C.F.R. § 16.505(b)(1)(ii)(B). GSA claims to have conducted a price-blind technical evaluation of proposals for the project, but A&D's bid price is clearly marked on one of the evaluators' score sheets for A&D's proposal. *Compare* AR Tab 12 at 2 *with id.* at 19. A&D asked for and was promised a post-award debriefing on January 10, 2006, but did not receive a debriefing until at least two months later. Even without delving into plaintiff's complaints with respect to alleged defects in GSA's evaluation of A&D's bid on technical, non-price factors, GSA's treatment of A&D's proposal does not have all the hallmarks of fairness.

Unfortunately, such questions are not for this court. The court is unaware of whether the GSA ombudsman was solicited for a review of this procurement. In any event, perhaps Congress' interest in procurement reform will someday be rekindled by cases which bear the mark of improprieties, but which stand beyond the reach of judicial review.

## CONCLUSION

For the foregoing reasons, plaintiff's complaint must be dismissed for lack

of jurisdiction. Accordingly, it is **ORDERED** that:

(1) Defendant's and Intervenor-Defendant's Motions to Dismiss, both filed on June 30, 2006, are **GRANTED**;

(2) Defendant's and Intervenor-Defendant's Motions for Judgment on the Administrative Record, both filed on June 30, 2006, are **DENIED** as moot;

(3) Plaintiff's Motion for Judgment on the Administrative Record, filed on July 7, 2006, is **DENIED** as moot;

(4) Plaintiff's Application for Temporary Restraining Order and Preliminary Injunction, filed on June 20, 2006, is **DENIED** as moot;

(5) Defendant's Motion to Strike Declaration of James Ballow Submitted with Plaintiff's Motion for Judgment upon the Administrative Record, filed on July 12, 2006, is **DENIED**;

(6) On or before **August 18, 2006**, counsel for each party shall **FILE UNDER SEAL** with the Clerk's Office a redacted copy of this opinion, with any material deemed proprietary enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter;

(7) The Clerk shall **ENTER** judgment for defendant and intervenor-defendant, **DISMISSING** the complaint, without prejudice; and

(8) Each party shall bear its own costs.

s/Lynn J. Bush

LYNN J. BUSH

Judge